OLEN F. MORRISON and wife Dorothy Y. Morrison,
Appellants, v. W. D. JONES and wife Ozella Jones,
Appellees. —430 S.W.(2d) 668.

Middle Section. March 29, 1968.

Certiorari Denied by Supreme Court August 5, 1968.

334

Thurman Thompson, Lewisburg, Womack & Mason, Fayetteville, for appellants.

Stevens & Bagley, Fayetteville, for appellees.

PURYEAR, J.   The appellees, W. D. Jones and wife, Ozella Jones, were the complainants below and the appellants, Olen F. Morrison and wife, Dorothy Y. Morrison, were the defendants below, so we will refer to the parties as complainants and defendants in addition to referring to them by name.

On June 18, 1966, the complainants, W. D. Jones and wife, Ozella Jones, filed their original bill in the Chancery Court of Lincoln County, Tennessee, against the defendants, Olen F. Morrison and wife, Dorothy Y. Morrison, and two other defendants who are not now involved in the case, alleging in the bill that the complainants are owners of a certain lot with two houses located thereon situated on West Edison Street in the town of Fayetteville, Tennessee; that the defendants, Olen F. Morrison and wife, Dorothy Y. Morrison, are the owners of a certain lot on West College Street, in the town of Fayetteville, which lies immediately south of the lot owned by complainants; that the property of both complainants and

defendants was, at one time, owned as a whole by Mrs. Vallie T. Sloan.

The bill further alleges that, beginning in September, 1965, the defendants constructed a building on their property which building encroached to the extent of three to ten feet over the boundary line between the properties of complainants and defendants and therefore, encroached upon the property of complainants by constructing a portion of their building upon same, also by digging and tearing away six feet of complainants' lot and leaving an embankment or drop-off of approximately nine feet.

The bill further alleges that such encroachment by the defendants on property of complainants was in absolute disregard of complainants' property rights and that the defendants were advised not to encroach upon complainants' property.

The bill prays for proper process, for a mandatory injunction requiring and commanding the defendants to restore complainants' property to its original condition insofar as possible, to remove that portion of the building and drainage structure thereof located upon complainants' property; that the complainants be awarded damages for the injury done to their property and for general relief.

To this bill the defendants, Morrison and wife, filed an answer generally admitting that they owned a lot or parcel of land on West College Street upon which they constructed a building; that the complainants owned a lot or parcel of land on Edison Street, and that the complainants' land and defendants' land adjoined each other.

In such answer, the defendants denied that they had encroached upon complainants' property and specifically

alleged that the building constructed by them was wholly upon their own property and further alleging that, although they did, in the process of constructing their building, pile some dirt upon the property of complainants, they aver that this was done with the express consent of complainants.

This answer generally denies that the boundary line between the property of defendants and complainants is located as the complainants allege in their bill.

The case was tried before the Chancellor on December 14th and 15th, 1966, upon oral and documentary evidence, with the exception of discovery depositions of defendant, Olen F. Morrison, and complainant, William D. Jones.

The Chancellor wrote a memorandum opinion which showed that he carefully and thoroughly considered all of the evidence, as a result of which he reached the following conclusions:

That beginning in 1964 the defendants acquired land from various owners in Fayetteville, on which to construct a shopping center, which construction work was done by a contractor by the name of Cartwright during the year 1965; that part of the defendants' land fronts on the north side of College Street and runs back north toward the next parallel street called Edison Street, the land in dispute fronting 80½ feet on College Street and running back to a lot supposed to be of the same width owned by the complainants, which lot of complainants fronts on Edison Street.

That in 1946 lots belonging to complainants and defendants composed one parcel owned by Mrs. Sloan, who at that time conveyed the lot fronting on College Street to a

Mrs. Diemer and the lot fronting on Edison Street to the complainants Jones and wife, and that the lot fronting on College Street was conveyed to the defendants, Morrison and wife, in 1965.

The conclusion reached by the Chancellor as to the general location of the boundary line between property of complainants and defendants was expressed in the memorandum opinion in the following language:

"The deed from Sloan to Diemer and from Diemer to Morrison call for a depth from College Street North of 210 feet on the east side and 215 feet on the West side. However, the northeast corner is designated as a bois d'arc tree which is still there and is agreed to be the tree spoken of in the deed, Sloan's deed to Jones likewise designates the bois d'arc tree as the southeast corner of his lot." (Tr. p. 63)

Then, further on in the opinion, the Chancellor established the boundary line between complainants' and defendants' lots as follows:

"The boundary between Morrison and Jones runs from the center of the bois d'arc westerly along the center of the rock wall to a point in the old Sloan and Muse line that is one foot north of the north wall of the building, the northeast part of the building encroaches across this boundary. It appears that traveling west from the tree the line strikes the east wall of the building about two feet south of its northeast corner and emerges from the north wall about 30 feet west of the corner." (Tr. p. 65)

In this memorandum opinion the Chancellor further reached the following conclusion:

"The conclusion from all this is Morrison encroached wilfully and intentionally, or at least in such a reckless manner as to amount to a wilful and intentional encroachment. But if mistaken in this he encroached across the true boundary after warning. The result is the same in either case." (Tr. p. 71)

Pursuant to the conclusions reached by him in this memorandum opinion, the Chancellor entered a decree granting complainants the following relief:

"It is, therefore, ordered, adjudged and decreed by the Court that the boundary line between the property of the complainants, W. D. Jones and wife, Ozella Jones, and the defendants Olen F. Morrison and wife, Dorothy Y. Morrison, begins at an iron pin in the center of the bois d'arc tree and runs in a straight line in a westerly direction to a point in the old Sloan and Muse line one foot North of the North wall of the Morrisons' building occupied by the defendants Brooks and Powers, which point is also 88 inches east of the east wall of the building occupied by A & P and owned by Morrison.

It is further ordered, adjudged and decreed that all of said building and drainage structure lying North of said line between the bois d'arc tree and said point in the old Muse and Sloan line encroaches on complainant's property, which encroachment includes but is not limited to generally the northeast corner of said building and generally all of the drainage structure.

It is further ordered, adjudged, and decreed that a mandatory injunction will issue commanding the defendants Olen F. Morrison and wife, Dorothy Y.

Morrison, to remove all of said encroachments from complainants' property and restore complainants' property substantially to its original condition before said encroachments within ninety (90) days from the entry of this decree.'' (Tr. pp. 73, 74)

From this decree, the defendants, Morrison and wife, have prayed and perfected their appeal to this Court and filed four assignments of error as follows:

1.

''The Court erred in holding that: 'The northeast corner is designated as a bois d'arc tree which is still there and is agreed to be the tree spoken of in the deed.'

2.

The Court erred in holding that: The building caused to be erected by Morrison or any part thereof, is located on the land of William D. Jones and wife, Ozella Jones.

3.

The Court erred in holding that: Morrison encroached wilfully and intentionally, or at least in such a reckless manner as to amount to a wilful and intentional encroachment.

4.

The opinion of the Court and the decree do not agree.''

It is not necessary for us to burden this opinion with a summary of all of the evidence in the case, but one outstanding fact is that the descriptive calls in both the Jones deed and the Morrison deed mention the bois d'arc tree as being the southern terminus of Jones' eastern boundary and the northern terminus of Morrisons' eastern boundary.

However, this bois d'arc tree is actually 86 feet from Edison Street instead of 79 feet, as called for in the Jones' deed, and is actually 207½ feet from College Street, instead of 210 feet, as called for in the Morrison deed. It is this discrepancy in distances which is the root of this unfortunate controversy.

This makes the case a classic example of necessity for application of the rule that courses and distances must yield to natural monuments, as was held by this Court in Minor v. Belk (1962), 50 Tenn. App. 213, 360. S.W.2d 477; Doss v. Tennessee Products & Chemical Corp. (1960), 47 Tenn.App. 577, 340 S.W.2d 923; Montgomery v. Nicely (1956), 42 Tenn.App. 223, 301 S.W.2d 379.

Many other cases could be cited in support of this rule, although it is generally not applied with as much force in settling disputes involving boundaries of town lots as it is in disputes involving boundaries of large acreage tracts, as was held by the Supreme Court in Pritchard v. Rebori (1916), 135 Tenn. 328, 186 S.W. 121.

Although, in the Pritchard case, supra, the rule was quoted with approval, it was not applied because the alleged monument, which was not allowed to control, was the "right-of-way" of a certain railroad, the outer limit of which right-of-way was not marked so as to be visible.

We think the learned Chancellor very properly applied this rule in the instant case, because the bois d'arc tree was a well defined and visible monument mentioned in the deeds of both parties.

Although the proof showed that this particular tree was one which had several branches from a single stump or root, the Chancellor quite properly held that the center

of this tree and not one particular branch thereof was the dividing point in the eastern boundaries of both lots and this conclusion is supported by Vanderbilt University v. Williams (1925), 152 Tenn. 664, 280 S.W. 689.

Therefore, the first and second assignments of error are respectfully overruled, and that portion of the Chancellor's decree establishing the boundary is affirmed.

The most serious and difficult question which confronts us is that which is raised under the third assignment in which the defendants challenge the basis of the Chancellor's decision to grant a mandatory injunction.

■ It is the general rule that the equitable remedy of injunction is not a matter of right, but is exercised only in the sound discretion of the Chancellor. Spencer v. O'Brien (1941), 25 Tenn.App. 429, 158 S.W.2d 445; Hall v. Britton (1954), 41 Tenn.App. 72, 292 S.W.2d 524.

■ It is also the general rule that a mandatory injunction will not be granted except in extreme cases and when courts of law are unable to afford adequate redress, or when the injuries complained of cannot be compensated in damages. Post v. Southern Railway Co. (1899), 103 Tenn. 184, 52 S.W. 301, 55 L.R.A. 481; Madison v. Ducktown Sulphur, Copper & Iron Co. (1904), 113 Tenn. 331, 83 S.W. 658; White v. N. C. & St. L. Ry. (1926), 1 Tenn. App. 467.

On this subject, Gibson says:

"Mandatory injunctions are never granted, unless the injury is irreparable, and unless the complainant used extraordinary diligence in applying for it in cases where delay or acquiescence would be prejudicial to the defendant." Gibson's Suits in Chancery, Fifth Ed., Sec. 870.

Apparently, the learned Chancellor was of the opinion that under the facts of the case, as he found them to be, he had no right to refuse granting of an injunction, because he used the following language in his memorandum opinion:

"Of course equity has no right to deny the injunction of its own choice and award damages instead. [Union Planters'] Bank & Trust Co. vs. [Memphis] Hotel Co., 124 Tenn. 649 [139 S.W. 715, 39 L.R.A.,N.S., 580]." (Tr. p. 72)

Union Planters' Bank & Trust Co. v. Memphis Hotel Company, supra, is a case in which the complainant below, Union Planters' Bank & Trust Company, filed a bill against the defendant below, Memphis Hotel Company, to enjoin the operators of the Peabody Hotel from discharging smoke coming from their heating system and being discharged by means of a smoke stack, which smoke together with soot and cinders therein was alleged to be soiling and blackening the walls, entering the windows and generally damaging the bank and trust building.

The only relief for which the complainants prayed in that case was an injunction enjoining the defendants and their servants and employees from causing dense smoke, soot, cinders, unconsumed gases or noxious vapors to issue from the chimneys or stack of the buildings known as the Peabody Hotel and Peabody Annex.

The Chancellor awarded such an injunction in his final decree and upon appeal, the Supreme Court held that while, in form, the injunction awarded by the Chancellor was not mandatory, it was, in reality, a mandatory injunction and its effect was to require the defendants to extend their smoke stack some fifty feet higher into the air in

order to bring it on a level with the roof of the Tennessee Trust Building.

The Supreme Court reversed the Chancellor and held that such injunctive relief should not be granted and refused to award complainants damages as an alternative remedy, holding that the awarding of such damages was not an equitable remedy and that when the jurisdiction of the Court failed because of denial of the injunction, the Court did not have jurisdiction to award such incidental relief as recovery of damages.

This rule has been applied in many later cases, including Tucker v. Simmons, 199 Tenn. 359, 287 S.W.2d 19, but the rule does not apply to the instant case because of an important distinction between it and the cases in which such rule has been applied.

It is a general rule that ''where a Court of equity has obtained jurisdiction over some portion or feature of a controversy, it may, and will in general, proceed to decide the whole issues, and to award complete relief, although the rights of the parties are strictly legal, and the final remedy is of the kind which might be conferred by a Court of law.'' 1 Pomeroy Equity Jurisprudence, 5th Ed., Sec. 231; Gibson's Suits in Chancery, 5th Ed., Sec. 45.

Although the bill filed by complainants in this case is not labeled as such, and there is no specific prayer therein seeking to have a disputed boundary established by the Court, it is also a well settled rule that under the prayer for general relief, a Court of equity may grant any relief other and different from that specifically indicated and prayed, which is justified by the averments of the bill and the proof. Montgomery v. Nicely, supra,

and cases cited therein at page 227 in Volume 42 Tennessee Appeals Reports, 301 S.W.2d 379.

It is readily apparent that the paramount question involved in the instant case is a disputed boundary between owners of adjoining or contiguous parcels of land and Chancery Court has jurisdiction in such cases under the provisions of T.C.A., Section 16-606 which is as follows:

"16-606. *Boundary disputes.*—The chancery court has jurisdiction to hear and determine all cases in which the boundary line or lines of adjoining or contiguous tracts of land is one, or the only question at issue in the case."

Montgomery v. Nicely, supra, was a case in which the complainant below originally filed suit in Circuit Court in which he sued the defendant below for damages for valuable timber alleged to have been wrongfully cut and removed from the land of the complainant below.

Prior to and at the time the dispute arose, the parties owned adjacent lands in the Fourth Civil District of Carter County, and after issues were joined in Circuit Court the case proceeded to trial. After hearing complainant's evidence, the Circuit Judge, on his own motion, decided the matters involved were of an equitable nature and accordingly ordered the case transferred to the Chancery Court.

Upon appeal from Chancery Court, the complainant insisted that the Chancellor erred in establishing the boundary line between the lands owned by himself and the defendant because the relief granted was beyond the scope of the pleadings and prayer for relief.

In passing upon the question, this Court said:

"Furthermore, the rule is well settled in this State, that under the prayer for general relief the Court may grant any relief other and different from that specifically indicated and prayed, which is justified by the averments of the bill and the proof. Gibson's Suits in Chancery, 4th Ed., sec. 557, p. 474; Haralson v. Jones, 33 Tenn.App. 572, 232 S.W.2d 415; Rhodes v. Johnson, 32 Tenn.App. 127, 222 S.W.2d 38; Holston Nat. Bank v. Wood, 125 Tenn. 6, 140 S.W. 31; Tennessee Ice Co. v. Raine, 107 Tenn. 151, 64 S.W. 29." Montgomery v. Nicely, supra, 42 Tenn. App. p. 227, 301 S.W.2d p. 381.

Therefore, under the broad powers of a Court of equity and under the general rule heretofore quoted from Professor Pomeroy's Equity Jurisprudence, the Chancellor was not necessarily compelled to grant the complainants a mandatory injunction and the case of Union Planters' Bank & Trust Co. v. Memphis Hotel Company, supra, is not in point, since the trial Court had jurisdiction to establish the disputed boundary between the contiguous parcels of land owned by complainants and defendants in the instant case. Having acquired jurisdiction for this purpose, although an injunction may not be granted, the Chancellor had authority and jurisdiction to award damages to complainants to compensate them for the encroachment upon their land by the defendants.

Although there is much evidence in the record to show that Mr. Morrison was warned by Mr. Jones that if he located the building where he said he wanted to locate it, he would, at his own peril, encroach upon the Jones lot, the harshness of applying the mandatory injunctive

process in this case compels us to closely examine Morrisons' reasons for taking the action which resulted in encroachment upon complainants' land.

Mr. Jones testified that shortly before the encroachment was made, Mr. Morrison offered to swap or exchange him a small area at one end of the disputed boundary line for a small area at the other end of the boundary line and thus change the boundary between the parties so that Morrisons' building would be located entirely upon his own land. It is insisted by Jones that this is evidence that Morrison knew that if he constructed the building by locating it as he wanted to locate it, there would be an encroachment upon the Jones lot.

Morrison explains this offer by the following testimony:

"Q. Now, why, Mr. Morrison did you attempt to get this extra footage on the back of your property?

A. Well, you need two or three feet to walk behind the building. You try to stay off this man's line approximately two feet. But you need some footage in which to walk in case something goes wrong with your building.

Q. Did you believe your building would be constructed on this man's property unless you gave him some more land?

A. No, sir." (B. of E. p. 167)

The evidence conclusively shows that a concrete drainage mat was constructed at ground level adjacent to the north wall of Morrisons' building and that this mat is on the Jones lot, even if the boundary between the two lots had been established as Morrison contended.

Morrison explains his action and the presence of the concrete mat on the Jones property in the following testimony in his discovery deposition:

"Q. You mean you are stating that your property runs even north of the existing concrete that has been poured in there some two or three feet?

A. Well, I don't know how wide that concrete is now— I don't know—your bank will fall off whenever you go digging straight down, your banks will fall off, you either have to fill it with concrete or I guess sue (sic) dirt. But I had already called—when this question arose I called Mr. Cartwright personally from here, from Mr. Clarence Mason's office and asked him not to go any further with that until the controversy was settled, if there was some mistake we needed to straighten it out, so the concrete being poured was without my knowledge and without my consent." (Tec. Rec. p. 33)

Although the contractor was acting as Morrison's agent in locating a portion of the building on the Jones land, Morrison's instruction to the contractor not to pour the concrete drainage mat until the dispute was settled must necessarily be taken into account in determining whether or not the encroachment was wilfully or recklessly made by Morrison.

Another fact to be considered is that Morrison was the first of the parties to engage a surveyor. In the spring of 1965, he employed a surveyor by the name of James Sanders, who surveyed the property before construction was commenced. Morrison's testimony on this phase of the matter is as follows:

"Q. I will ask you if you had a survey made of that property before you started any construction on it?

A. Yes, sir.

Q. Who made that survey?

A. Mr. Sanders from Pulaski.

Q. And is he a surveyor?

A. Yes, sir.

Q. And when did he make this first survey?

A. The survey was made in the early Spring of '65.

Q. And what did you learn as a result of that survey?

A. That I had my 210 feet and my 215 feet of land.

Q. And did you learn the boundaries of your property?

A. Yes, sir, at the time, he drove down stakes.

Q. You say he drove down stakes at the time?

A. Yes, sir.

Q. And did he show you these stakes?

A. Yes, sir.

Q. And I will ask you if these boundaries were pointed out to you?

A. Yes, sir.

Q. By him?

A. Yes, sir, Mr. Sanders." (B. of E. pp. 164, 165)

Neither the surveyor, Sanders, nor the contractor, Cartwright testified. The Chancellor's decision to hear

the case upon oral proof was made over objection of defendants' counsel. Such counsel had subpoenaes served on these two men and were diligent in their efforts to obtain their testimony, so it cannot be presumed from their failure to testify, that their testimony would have been unfavorable to the defendants.

On the result of this survey, Mr. Morrison also testified as follows:

"Q.  I believe you said—or stated that Mr. Sanders came back and made another survey and this survey agrees with this one—that's what you stated on direct examination?

A.  No, sir, he came back and rechecked the boundary lines, and the east line was the one in controversy and said I was well on my property. And told me that I could proceed and go ahead." (B. of E. p. 183)

Another fact which must be taken into consideration is that complainants did not file suit and seek a prohibitory injunction when they first discovered that an encroachment was being made upon their land or soon thereafter, but waited until after the building was complete to file suit and now they seek to have a portion of the building dismantled and removed.

Although the defendants did not, in their answer, rely upon estoppel or laches, we must, for the purpose of considering the equities of complainants' prayer for a mandatory injunction, adhere to the principle that the equitable remedy of injunction must be applied for with reasonable promptness, as was held in Madison v. Ducktown Sulphur, Copper & Iron Co., supra, and the long list of cases cited therein.

"Equity requires a party to assert his rights in a reasonable time after he discovers that he has been wronged." Granberry v. Jones (1949), 188 Tenn. 51, 216 S.W.2d 721.

In our opinion, removal of that portion of the defendants' building which encroaches upon the complainants' lot will impose an undue hardship upon the defendants and result in little, if any, benefit to the complainants. Such should not be the result of an equitable action if any other adequate means of redress is available.

The Chancellor also expressed some doubt in this area, as noted by the following language in his memorandum opinion:

"Attention is called by counsel to the imbalance between the expense to Morrison and the benefit to Jones of removal. It is indicated by the above authorities that the principle has no application where the encroachment is not innocently made.

An award of actual damages is spoken of. Properly supplemented by some punitive damages this might be a more appropriate remedy. Jones should give it some consideration. If he does he could not expect to assuage his wounded feelings completely and would have to temper his demand with justice. His action would be subject to scrutiny on proper application." (Tec.Rec. pp. 71, 72)

In our opinion, the facts of the case make it necessary for us to exercise our discretion, in reviewing this case de novo, by denying the complainants the right to a mandatory injunction compelling the defendants to remove that portion of their building which encroaches upon

complainants' land, and instead, order a recovery of damages in favor of complainants and against defendants.

An examination of the record fails to disclose to us sufficient evidence therein from which we can determine the amount of damages which the complainants are entitled to recover from the defendants for encroachment upon complainants' property.

The only evidence as to the amount of damages done to the complainants' property is the following testimony of the complainant, W. D. Jones:

"Q. Mr. Jones, in your opinion, and based upon what a willing seller would sell for, and a willing buyer would buy for, would pay for, what was the value of your property, you and your wife's property on Edison Street before Mr. Morrison came up and made these excavations and buildings?

A. Mr. Bagley, I would say $6,000.

Q. About six thousand dollars. All right. Now, in your opinion, Mr. Jones, what after these various buildings and concrete and excavations and so forth, what would a willing buyer pay and a willing seller take for this property after Mr. Morrison has done these things up there? What would be the value of your property?

A. I would say about $3,500.

Q. Now, has your property diminished in value since all this construction?

A. Definitely so. Yes, sir.

Q. What is one of the reasons?

A. One of the reasons is that I don't have the amount of land that I purchased, that would be one reason that

I couldn't sell the amount of land that I had purchased. And another reason, there is a deep hole left wide open in the rear beside the toilet there that is so deep the girl that lives there don't allow the children to play outdoors, because they might fall in there and break their necks, and kill themselves." (B. of E. pp. 273, 274)

The foregoing evidence does not show how much depreciation in value of the Jones property resulted from construction of a large commercial building upon the adjoining property and how much resulted from the encroachment itself, therefore, we must remand the case to the trial Court for the purpose of ascertaining such damages that are to be awarded to complainants.

The third assignment of error is sustained and the Chancellor's decree will be modified by reversing and setting aside that portion of such decree granting complainants a mandatory injunction requiring defendants to remove the portion of their building which encroaches upon land of the complainants and, awarding instead, to the complainants a recovery of damages.

For the purpose of fixing such damages, the case will be remanded to the trial Court. Of course, the amount awarded to the complainants should include such damages as they sustained by reason of the fact that dirt was piled upon their property during construction, because we find that the evidence preponderates against the contention of defendants that this dirt was piled upon complainants' property with their consent.

In their fourth assignment of error, defendants insist there is a discrepancy between the trial Court's opinion and decree. We assume from statements in their

brief that the language in the decree which they claim creates such a discrepancy is as follows:

"* * * which point is 88 inches east of the east wall occupied by A & P and owned by Morrison."

This language does not appear in the memorandum opinion, but there is nothing in the record to indicate that the eastern terminus of the boundary line established by the Chancellor, in his memorandum opinion, is not "88 inches east of the east wall of the building occupied by A & P and owned by Morrison."

Therefore, we do not think the record shows any discrepancy or conflict between the opinion and the decree.

The fourth assignment of error is respectfully overruled.

The case will be remanded to the Chancery Court of Lincoln County, Tennessee, for the purpose of hearing additional proof and fixing damages to be awarded to complainants and for such other and further proceedings, consistent with this opinion, as may be necessary and proper. The costs of this proceeding, including costs of appeal, will be paid, one-half thereof by the complainants and the other one-half thereof by the defendants.

Shriver, P. J., and Todd, J., concur.